UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAVONTE ROBINSON,**<br>　　　Plaintiff,<br><br>　　　v.<br><br>**DISTRICT OF COLUMBIA et al.,**<br>　　　Defendants. | Civil Action No. 23-2961 (JDB) |

### MEMORANDUM OPINION

Javonte Robinson alleges that he was unlawfully cast out of a Washington, D.C., homeless shelter in April 2021 and forced to sleep on the streets throughout the COVID-19 pandemic. He sued the shelter operator and the District of Columbia, as well as employees of each, in D.C. Superior Court, asserting two federal claims (for discrimination and for due process violations) and seven state law claims. Defendants removed the case to this Court. Now before the Court is Robinson's motion to amend his complaint, filed in response to defendants' motions to dismiss. While full briefing on defendants' motions to dismiss has been stayed pending resolution of the motion to amend, the parties have addressed the merits of these motions through the prism of their motion to amend arguments. Specifically, defendants contend that any amendment would be futile because Robinson's proposed amended complaint would not survive a motion to dismiss.

For the reasons that follow, the Court concludes that amendment would be futile as to Robinson's federal discrimination claim and as to at least part of his federal due process claim. The question then becomes whether this case should proceed in federal court. The answer is no. Accordingly, the Court will exercise its authority to sua sponte (1) dismiss the discrimination count and the due process count insofar as it relates to Robinson's denial of access to the shelter and (2) remand the case—i.e., the remaining claims—to D.C. Superior Court for further proceedings.

1

**Background**

I. **Factual Background**

Robinson is an "African-American man in his 20's" who resided at Kia's Place IV, a homeless shelter in Washington, D.C., starting in July 2020.[1] Compl. & Jury Demand [ECF No. 15-1] ("Am. Compl.") ¶¶ 9, 15. At the time of the incidents at issue, Kia's Place IV was operated by Echelon Community Services ("ECS") as a "long-term transitional housing program specifically for youth ages 18-24[,] . . . [providing] housing and intensive support services for participating youth for up to six years with the goal of stabilizing the youth and preparing them for independence as they transition to adulthood." Id. ¶¶ 10–11. This program was funded by the District of Columbia (the "District"), and Robinson alleges that ECS acted as the District's "agent" in administering it. Id. ¶ 12.

Robinson claims that ECS/Kia's Place IV "failed [him] with the exact support the program was designed to administer to him." Id. ¶ 11. Specifically, on April 15, 2021, "Kia's Place IV employees called the Metropolitan Police Department on Mr. Robinson and falsely accused him of things that he did not do." Id. ¶ 15. His placement at the long-term shelter was then "illegally terminated" and defendants "told him that he could not return." Id. ¶ 16. He went to jail and, upon release, was told he could not return to retrieve his belongings, including "clothes, shoes, mail, toiletries, food, etc.," but "was told . . . he would have to call [the police]." Id. ¶¶ 17–18.

ECS informed the District of Robinson's termination on April 16, 2021. Am. Compl., Ex. A [ECF No. 15-1] ("Admin. Rev. Decision") at 1. Pursuant to protections provided by D.C.'s Homeless Services Reform Act, D.C. Code § 4-751.01 et seq. ("HSRA"), Robinson requested review from the District's Office of Administrative Hearings, which also triggered an

---

[1] The factual background is drawn from the allegations in Robinson's proposed amended complaint and the exhibits attached thereto. On consideration of a motion to amend, the Court accepts the complaint's allegations as true.

2

administrative review within the District's Department of Human Services ("DHS"). Id. at 2. A DHS administrative review officer held a telephonic administrative review hearing with Robinson and a representative of ECS on May 24, 2021, and concluded that DHS had violated a procedural requirement of the HSRA by failing to issue a "compliance finding" upholding ECS's decision until six days after Robinson was terminated from the shelter. Id. at 4; see id. at 2. Accordingly, because of the "procedural flaw in the executing of this emergency action," the administrative review officer determined that Robinson should be "reinstated." Id. at 4.

Robinson engaged legal counsel, who helped him reach an agreement with defendants that he could return to Kia's Place IV on August 13, 2021. Am. Compl. ¶ 26. Shortly before this return, however, ECS employees sought and obtained a temporary protective / anti-stalking order against him. See id. ¶¶ 26–27. So when Robinson returned to the shelter, he was denied entry and staff called the police to serve him with this order. Id. ¶ 26. The anti-stalking petition—which an ECS employee filed in support of the order—alleged two supporting incidents from April 15 and 17, 2021. Am. Compl., Ex. E [ECF No. 15-1] at 1. In the first incident, Robinson, who "ap[p]eared to be under the inf[l]u[e]nce," allegedly shoved an ECS staff member and "busted th[r]oug[h] the door" of an office where she went to hide, "turned off the cameras and bega[]n to make threat[]s to [her] life," as well as "hit[] [her]" and "[k]nock[ed] the phone out of [her] hand." Id. In the second incident, Robinson allegedly "entered the building asking where [she] was and was making threat[]s to [her] life saying he was going to kill [her]." Id. Robinson asserts that the order was obtained as part of a "conspiracy" among the defendants to prevent him from returning to the shelter. Am. Compl. ¶ 29. He further claims that the "employee lied" and that the petition was an improper vehicle premised on untimely allegations. Id. ¶ 28.

"At some point thereafter, the Anti-Stalking order was lifted and a permanent one was denied" but "Kia's Place IV . . . didn't contact [Mr. Robinson] to tell [him] that he could return."

3

Id. ¶¶ 30–31.  Robinson's counsel informed ECS/Kia's Place IV that Robinson would be filing suit.  Id. ¶ 32.  Finally, the shelter "attempted to arrange for Mr. Robinson's return," but Robinson was "fearful for his safety to return" after "being falsely accused, harassed, illegally kicked out, and more."  Id. ¶¶ 32–33.  Communications concerning placement at another shelter were unsuccessful.  Id. ¶ 34.

Robinson alleges that this chain of events caused him "severe emotional distress[;] [he] was humiliated, homeless, arrested, had to go to court for a frivolous anti-stalking petition, deprived of his property, and more from all the Defendants' malicious, negligent, and intentional acts and omissions."  Id. ¶ 36.  Further, Robinson alleges that he has been "left to sleep outside, homeless, and then hang out with people in order to 'survive,'" which has caused his mental health to decline, and that he has "ended up going to jail from criminal charges."  Id. ¶ 37.

## II. Procedural Background

Robinson filed the present lawsuit in D.C. Superior Court on May 26, 2023, naming as defendants the District, ECS – Kia's Place IV, Roxanne Murray ("an employee for [ECS]"), Latarsha Cheeks-Lucas (same), the District's DHS, and Tamara Mooney (an "employee for [DHS]").  Compl. & Jury Demand [ECF No. 1-2] ("Compl.") at ¶¶ 2–7.  Robinson's complaint asserts that defendants (I) violated his right to shelter in "severe or frigid weather" under the HSRA; (II) discriminated against him "based on his mental disability, source of income, and appearance" in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. ("DCHRA"); (III) conspired to abuse process to prevent him from returning to the shelter; (IV) engaged in various negligent acts; (V) discriminated against him under federal law based on his disabilities; (VI) converted his personal belongings; (VII) engaged in intentional infliction of emotional distress; (VIII) terminated his residence and kept his personal property without due

4

process; and (IX) breached an agreement with Robinson to provide mental health services, job placement, and future housing. Id. ¶¶ 32–88.

On the basis of the federal discrimination and due process claims, the District removed the case to this Court on October 4, 2023. Notice of Removal [ECF No. 1] ¶¶ 3, 6. Defendants then moved to dismiss. See Def. D.C.'s Mot. to Dismiss [ECF No. 7]; Defs.' ECS – Kia's Place IV's & Roxanne Murray's Mot. to Dismiss [ECF No. 8] ("ECS MTD"). Robinson responded by filing a motion to stay the opposition deadline and a motion to amend the complaint. Opposed Pl.'s Mot. for Leave to File First Am. Compl. [ECF No. 15] ("Mot. to Amend"); Pl.'s Mot. for Stay of Dispositions for Mots. to Dismiss [ECF No. 16]. The proposed amended complaint added claims for gross negligence and negligent infliction of emotional distress, as well as additional factual allegations and exhibits responsive to some of defendants' motion to dismiss arguments. See, e.g., Am. Compl. ¶¶ 106–10, 144–48.

The Court granted the motion to stay the motion to dismiss opposition deadline. Oct. 30, 2023 Min. Order. Defendants then filed oppositions to Robinson's motion to amend, largely repeating arguments made in their motions to dismiss and asserting that amendment would be futile because the amended complaint would not withstand a motion to dismiss. Def. D.C.'s Opp'n to Mot. to Amend [ECF No. 18] ("D.C. Opp'n"); Defs. ECS – Kia's Place IV's & Roxanne Murray's Opp'n to Mot. to Amend [ECF No. 19] ("ECS Opp'n"). Robinson submitted a reply brief to each opposition, arguing that his claims would withstand a motion to dismiss and that amendment should be permitted. Pl.'s Reply to D.C. Opp'n [ECF No. 20]; Pl.'s Reply to ECS Opp'n [ECF No. 21]. The motion to amend is now fully briefed and ripe for resolution.

## Legal Standard

Leave to amend a complaint should be "freely give[n]" when "justice so requires." Fed. R. Civ. P. 15(a)(2). But "[l]eave may properly be denied if the proposed amendment is 'futil[e],'

5

such that it would not withstand a motion to dismiss." Singletary v. Howard Univ., 939 F.3d 287, 295 (D.C. Cir. 2019) (second alteration in original) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). When a defendant opposes amendment on futility grounds, a court's analysis is "for practical purposes, identical to [the analysis of] a Rule 12(b)(6) dismissal based on the allegations in the amended complaint." In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215–16 (D.C. Cir. 2010) (internal quotation marks omitted). A complaint will "survive a motion to dismiss if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Singletary, 939 F.3d at 295 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft, 556 U.S. at 678). As would be appropriate on a motion to dismiss, the court relies exclusively on the facts alleged in "the proposed complaint, documents attached to or incorporated by reference in that complaint, and matters of which the court may take judicial notice." Id. at 293 n.1.

## Analysis

This case comes before the Court having been removed from D.C. Superior Court on the basis of a federal discrimination claim and a federal due process claim. The Court will begin by analyzing the federal claims, then turn to the question whether supplemental jurisdiction should continue to be exercised, or if instead the case should be remanded to D.C. Superior Court.

### I. Fair Housing Act Claim (Count V)

Robinson alleges that defendants discriminated against him under the Fair Housing Act, 42 U.S.C. § 3601 et seq., by failing to make reasonable accommodations necessary to afford him an equal opportunity to live at Kia's Place IV. Am. Compl. ¶¶ 111–21. Specifically, Robinson alleges that he "suffered with emotional and mental[] disabilities such as ADHD, PTSD, and

Depressive disorder." Id. ¶ 114.  He claims that defendants were aware of these conditions because they had his medical records.  Id.  But "[r]ather than provide accommodation for Mr. Robinson, so that he could remain with housing, Defendants instead refused and made no attempts."  Id. ¶ 117.

The Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2).  Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  Id. § 3604(f)(3)(B).  In order to plead a reasonable accommodation claim, a plaintiff must allege "(1) the existence of a handicap as defined in 42 U.S.C. § 3602(h); (2) that defendants knew or reasonably should have known of the handicap; (3) that the accommodation 'may be necessary' to afford handicapped persons an equal opportunity to use and enjoy the dwelling; and (4) that defendants refused to make the requested accommodation."  United States v. District of Columbia, 538 F. Supp. 2d 211, 217–18 (D.D.C. 2008); see also Hunt v. Aimco Properties, L.P., 814 F.3d 1213, 1225–26 (11th Cir. 2016).

Defendants argue that Robinson's claim would not survive a motion to dismiss because he has not alleged what reasonable accommodation he requested, why such accommodation would be needed, or why his alleged disabilities qualify as "handicaps" under the statute.  See D.C. Opp'n at 6–7; ECS Opp'n at 6.  The Court agrees.

A "handicap" is defined in the Fair Housing Act to include "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).  "Whether a plaintiff has an impairment and whether it substantially limits a major life

7

activity is to be decided on a case-by-case basis." Dadian v. Village of Wilmette, 269 F.3d 831, 837 (7th Cir. 2001). While Robinson has pleaded that he has "emotional and mental[] disabilities such as ADHD, PTSD, and Depressive disorder," Am. Compl. ¶ 114, his proposed amended complaint has not alleged that those diagnoses "substantially limit[] one or more of [his] major life activities" or resulted in defendants regarding him as mentally impaired. 42 U.S.C. § 3602(h); see Smith v. AMH 2014-1 Borrower, LLC, No. 23-13273, 2024 WL 1460309, at *2 (11th Cir. Apr. 4, 2024) (per curiam) (affirming dismissal of complaint where plaintiff failed to "allege any further facts [beyond his Crohn's Disease diagnosis and brief hospital stay] about his health or how his [] disease affects his major life activities"); see also Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 639 (4th Cir. 2016) (affirming dismissal of complaint where plaintiff merely alleged a "mood disorder").

Even assuming that Robinson has sufficiently pleaded a "handicap," he has not sufficiently alleged that defendants refused to make a requested accommodation. Under the Fair Housing Act, a housing provider is "only obligated to provide a reasonable accommodation . . . if a request for the accommodation has been made." Douglas v. Kriegsfeld Corp., 884 A.2d 1109, 1122 (D.C. 2005) (quoting Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act ("Joint Statement") 11 (May 17, 2004) [2], https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf); see Parham v. CIH Properties, Inc., 148 F. Supp. 3d 5, 11–12 (D.D.C. 2015) (noting that the "underlying assumption of any reasonable accommodation claim is that the plaintiff . . . has

---

[2] Many courts have relied on the Joint Statement as persuasive interpretation of the requirements of the Fair Housing Act. See, e.g., Bhogaita v. Altamonte Heights Condo. Ass'n, 765 F.3d 1277, 1286 n.3 (11th Cir. 2014) ("Though the Joint Statement is a policy statement, rather than an authoritative interpretation of [the Act] and therefore does not warrant Chevron-style deference, it is nonetheless entitled to respect [under Skidmore] to the extent it has the power to persuade." (internal citations and quotation marks omitted)).

requested an accommodation which the defendant . . . has denied" (omissions in original) (quoting Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999)))." However, the Act "does not require that a request be made in a particular manner." Douglas, 884 A.2d at 1122 (quoting Joint Statement at 10).

Robinson seems to argue that he requested a reasonable accommodation when he asked to return to the shelter following the disputed April 2021 incident and the DHS administrative review officer's determination that his housing should be reinstated. See Pl.'s Reply to D.C. Opp'n at 9 (contending that defendants violated the Fair Housing Act by "never ma[king] a good faith effort for accommodations for him after he requested to reenter the facility" despite being aware of his mental impairments). This argument suggests, in essence, that defendants should have "'open[ed] a dialogue' with [him], eliciting more information as needed, to determine what specifics [he had] in mind and whether such accommodation would, in fact, be reasonable under the circumstances." Douglas, 884 A.2d at 1122.

There is authority to support the argument that a request to remain in housing after the resident allegedly makes threats or otherwise impairs the health and safety of others can be a request for a reasonable accommodation. For example, in Hunt, the Eleventh Circuit concluded that a mother adequately pleaded a reasonable accommodation claim when she requested to remain in housing while she sought day care for an adult son with Down Syndrome, who had allegedly threatened building staff. 814 F.3d at 1226. In this request, she essentially asked for "an accommodation in the form of an exception to [the landlord's] apparent policy or practice of not renewing the leases of tenants who make threats." Id. The Joint Statement, a guidance document written by the two agencies charged with administering the Fair Housing Act, also suggests that a request for a "second chance" may suffice as a request for a reasonable accommodation, at least when the resident has received intervening treatment or medication that would eliminate the threat.

See Joint Statement at 4–6; Sinisgallo v. Town of Islip Hous. Auth., 865 F. Supp. 2d 307, 341–42 (E.D.N.Y. 2012) (concluding that a tenant who committed an act of violence requested a reasonable accommodation by seeking a probationary period from the housing authority to show that his medication and treatment prevented him from continuing to be a threat).

But Robinson's proposed amended complaint does not articulate this kind of request. In that pleading, Robinson alleges that his counsel "attempted to arrange for [his] return" to Kia's Place or for placement in another shelter. Am. Compl. ¶¶ 32–34. These allegations, combined with defendants' alleged knowledge of his disabilities, id. ¶ 114, might together suggest that negotiations involved a request for a reasonable accommodation that would facilitate his return to housing. However, the complaint does not specify that Robinson asked for anything beyond returning to housing. Plaintiff has not alleged, for example, that he sought a probationary return, or a return conditioned on treatment, or any alternative arrangements. The complaint does not offer even a hint of what Robinson requested to facilitate his return to Kia's Place IV in light of his disabilities. Without allegations as to what was requested, the Court is unable to assess whether any such requested accommodations might be necessary to afford Robinson equal use and enjoyment of a shelter. Accordingly, the Court concludes that Robinson's amended complaint does not sufficiently plead a request for a reasonable accommodation.[3] Cf. Ravenell v. Mayorkas, Civ. A. No. 22-3548 (JDB), 2024 WL 1344460, at *15 (D.D.C. Mar. 29, 2024) (dismissing

---

[3] In addition to his reasonable accommodation claim, Robinson's allegations also point to a disparate treatment claim. See Am. Compl. ¶ 115 (asserting that defendants treated Robinson "worse than other residents," "discriminated against him," and "conspired to have him kicked out of the residence illegally"); see id. ¶¶ 114–119. Robinson makes no legal argument in support of this theory and relies exclusively on case law supporting a "reasonable accommodation" theory of discrimination. See Am. Compl. ¶¶ 112–13; Pl.'s Reply to D.C. Opp'n at 8–9. Robinson also fails to plead facts sufficient to permit an inference of disparate treatment. See Boykin v. Gray, 895 F. Supp. 2d 199, 208 (D.D.C. 2012) (dismissing disparate treatment claim under the FHA because plaintiffs "made no allegations that, accepted as true, could serve as 'direct evidence of discriminatory intent,' nor that could 'permit an inference of discrimination'" (quoting Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999))). Robinson has offered only conclusory allegations that defendants denied him housing or otherwise discriminated against him based on his "mental impairments." Accordingly, to the extent Robinson is making this claim, it also would not withstand dismissal.

employee's reasonable accommodation claim for failure to allege that he "actually requested an accommodation"). Hence, Robinson's federal discrimination claim, as alleged in the proposed amended complaint, would not survive a Rule 12(b)(6) motion to dismiss and the proposed amendment would be futile.[4]

## II. Due Process Claim (Count VII)

Robinson also alleges that defendants "kicked him out of his living residence and kept his personal property without due process." Am. Compl. ¶ 139. Specifically, Robinson claims that defendants terminated his residence in Kia's Place IV without notice and failed to "go through the proper protocol and hearings that were required by law." Id. ¶¶ 139–140. Further, he asserts that his due process rights were violated when defendants did not allow him to retrieve his personal property from the shelter. Id. ¶ 142.

Although Robinson does not specify, the Court understands him (as do defendants) to be alleging a violation of procedural rather than substantive due process. Defendants argue that Robinson's amended complaint does not state a procedural due process claim because Robinson does not have a constitutionally protected interest in shelter and, even if he did, he was afforded more process than the Constitution requires. See D.C. Opp'n at 9; ECS Opp'n at 8–9.

"The Fifth Amendment's Due Process Clause prohibits the District of Columbia from depriving persons of 'property, without due process of law.'" Washington Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 36 (D.C. Cir. 1997) (quoting U.S. Const. amend. V). To survive a motion to dismiss, a plaintiff must plausibly allege that he had a protected property interest and that he was deprived of the interest without due process of law. Badgett v. District of Columbia, 925 F. Supp. 2d 23, 30 (D.D.C. 2013). A protected property interest may arise from the

---

[4] The Court also reviewed the claim as alleged in the original complaint and concluded it would not survive a motion to dismiss for the same reasons.

11

Constitution or another independent source of law, i.e. a statute or regulation. Washington Legal Clinic, 107 F.3d at 36.

Robinson concedes that, in general, "[a] homeless person or client who receives medical or other services in the District from a provider does not have a protected property right or interest in those services grounded either in the U.S. Constitution or any District of Columbia statute." Am. Compl. ¶ 40 (citing Baltimore v. District of Columbia, 10 A.3d 1141, 1144 (D.C. 2011)); Boykin v. Gray, 895 F. Supp. 2d 199, 220 (D.D.C. 2012) (concluding that homeless plaintiffs' due process claim failed for lack of a protected interest in shelter). However, such individuals have a "statutory entitlement [under the HSRA] to shelter in severe or frigid weather." Baltimore, 10 A.3d at 1143; see id. at 1154; D.C. Code § 4-755.01(a) ("No provision of [HSRA] shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions." (emphasis added)). Hence, whether Robinson was deprived of a protected property interest turns on whether he was deprived of shelter in severe weather. See Pl.'s Reply to D.C. Opp'n at 11; Am. Compl. ¶ 40.

HSRA defines severe weather as "[w]henever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit." D.C. Code § 4-753.01(c)(1). Under such circumstances, "the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any resident of the District who is homeless and cannot access other housing arrangements." Id. The statute permits individuals "to sue in severe weather for the full measure of the statutory protections afforded them." District of Columbia v. Reid, 104 A.3d 859, 863 (D.C. 2014).

Robinson alleges that he was terminated from Kia's Place IV in April 2021 and remained homeless despite "attempt[ing] to return several times." Am. Compl. ¶ 44. Attached to his complaint are news articles indicating that the temperature rose above 95 degrees from June 27–30, 2021, and from July 6–7, 2021. Am. Compl., Ex. B [ECF No. 15-1]. He argues that these allegations together state a plausible claim. Pl.'s Reply to D.C. Opp'n at 5; see Am. Compl. ¶¶ 22, 44. Defendants respond that Robinson has not sufficiently pleaded that he was denied housing during severe weather because he does not allege "what days [he] attempted to return and whether or not on those 'several times,' the temperature was 95 degrees or above." ECS Opp'n at 3; see D.C. Opp'n at 2 ("Plaintiff makes no allegations that he attempted to secure shelter and was refused on those particular days.").[5] The Court is skeptical that Robinson has sufficiently alleged deprivation of an entitlement to shelter in severe weather. Robinson has demonstrated at most that he was not able to return to Kia's Place IV on the severe weather days in the summer of 2021; he has not alleged that the District generally denied him access to suitable housing. Cf. Boykin, 895 F. Supp. 2d at 220 (dismissing claims of plaintiffs who did not allege they were among those denied shelter during an extremely cold night).

But even if Robinson were deprived of shelter during severe weather, he has not plausibly alleged "that the process available [to him] was inadequate nor that [he] w[as] denied such process." Badgett, 925 F. Supp. 2d at 30. When a plaintiff will be deprived of a protected property interest, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Tate v. District of Columbia, 627 F.3d 904, 908 (D.C. Cir. 2010) (quotation marks omitted) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). Robinson's residence at Kia's Place IV was terminated pursuant to the emergency

---

[5] The parties primarily make these arguments in the context of Robinson's direct HSRA claim, but the Court addresses them here because they are relevant to whether Robinson has plausibly alleged a property interest in shelter during severe weather.

termination provision of HSRA. That provision states that "[w]henever a client presents an imminent threat to the health or safety of the client or any other person on a provider's premises" the provider is authorized to terminate the client within 24 hours without providing written notice. D.C. Code § 4-754.38(a). The provider must, however, immediately notify DHS of the termination and "endeavor to provide written notice" to the client within 15 days. Id. § 4-754.38(b), (e). DHS, then, must within 24 hours "issue a written finding of whether the emergency . . . termination order complies with the requirements of [the statute]." Id. § 4-754.38(e). Upon termination, the client is entitled to a "fair hearing" review by the District's Office of Administrative Hearings, see id. §§ 4-754.38(e), 4-754.41, as well as "administrative review" by DHS, id. § 4-754.41(e), § 4-754.42.

Robinson's complaint contains no allegation that these procedures were inadequate. See Yates v. District of Columbia, 324 F.3d 724, 726 (D.C. Cir. 2003). At most, he argues that his emergency termination violated due process because it was issued without prior notice. Am. Compl. ¶¶ 139–140. But it does not. While due process generally requires a pre-deprivation hearing, "summary administrative action may be justified in emergency situations," such as when "swift action is necessary to protect the public health and safety." Hodel v. Va. Surface Mining and Reclamation Ass'n, 452 U.S. 264, 300–01 (1981). That Robinson disputes whether he actually endangered the safety of staff members at Kia's Place IV does not render the process of emergency termination followed by timely post-deprivation hearings unlawful. "The relevant inquiry is not whether [an] order should have been issued in a particular case, but whether the statutory procedure itself is incapable of affording due process." Id. at 302. He has not challenged the process here.

Moreover, Robinson's complaint, the documents attached thereto, and administrative records of which the Court may take judicial notice together demonstrate that Robinson received due process after he was terminated on an emergency basis from Kia's Place IV. ECS notified DHS of the termination on April 16, 2021. See Admin. Rev. Decision at 1. DHS reviewed that

termination decision and issued a compliance finding on April 22, 2021. Id. Robinson requested a fair hearing with the Office of Administrative Hearings on April 26, 2021. Id. at 2. DHS's Office of Administrative Review received notice of Robinson's request on May 11, 2021, and scheduled a telephonic hearing with Robinson for May 24, 2021. Id. The administrative review officer concluded that DHS failed to issue a compliance finding within 24 hours, as required by statute, and reinstated Robinson to Kia's Place IV. Id. at 4. Robinson then also received a hearing before the Office of Administrative Hearings. ECS MTD, Ex. F [ECF No. 8-6] at 2. That administrative case was ultimately dismissed without prejudice on January 10, 2022, with Robinson retaining a right to seek reconsideration or to appeal the decision to the D.C. Court of Appeals. Id. at 3–4.[6] Against this backdrop, Robinson only offers a conclusory allegation that defendants failed to "go through the proper protocol and hearings that were required by law." Am. Compl. ¶ 139. That is not enough to survive a motion to dismiss.

Indeed, Robinson received a favorable outcome here through the review process when the DHS administrative review officer ordered his placement reinstated. That defendants did not ultimately restore his housing does not establish a due process violation. While such conduct "may well give rise to [liability] under D.C. law[, . . .] it did not deprive [Robinson] of the only process due—namely, timely notice and a hearing." Tate, 627 F.3d at 908.[7] Hence, amendment of the due process claim based on his termination from the shelter without notice would be futile.[8]

---

[6] The Court takes judicial notice of the occurrence and outcome of this proceeding, which occurred before the Office of Administrative Hearings. See Mehle v. Am. Mgmt. Sys., Inc., No. 01-7197, 2002 WL 31778773, at *1 (D.C. Cir. Dec. 4, 2002) (per curiam).

[7] Robinson's reply briefs also contend that defendants violated his due process rights by conspiring to use an anti-stalking order to prevent him from returning to the shelter and making it impossible for him to find housing at another facility. Pl.'s Reply to D.C. Opp'n at 10–11. None of these arguments states a procedural due process violation.

[8] The Court has also reviewed the claim as alleged in the original complaint and concluded that it would not survive a motion to dismiss for the same reason.

Defendants do not address Robinson's apparently separate contention that he was deprived of his property without due process when he was not allowed to retrieve his belongings from Kia's Place IV. Considering Robinson's admission that ECS told him that he could retrieve his belongings with police assistance, see Am. Compl. ¶¶ 17–18, the Court is doubtful that this claim is viable. But absent briefing from the parties, the Court declines to rule on the question.[9]

### III. Supplemental Jurisdiction

At this point, the Court has concluded that the proposed amendment to Robinson's federal housing discrimination claim would be futile, as would the proposed amendment to Robinson's due process claim as it concerns the denial of shelter. The Court has also concluded that the corresponding claims in Robinson's original complaint would not survive a motion to dismiss for the same reasons. The Court will accordingly dismiss Robinson's Fair Housing Act claim and his federal due process claim with respect to the deprivation of shelter. The Court acknowledges that defendants' motions to dismiss were not fully briefed but considers dismissal of the claims to be warranted because plaintiff cannot prevail based on the facts alleged in the complaint or the proposed amended complaint. Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 127 (D.C. Cir. 2012) (quoting Baker v. Dir., U.S. Parole Comm'n, 916 F.2d 725, 727 (D.C. Cir. 1990)). Further, dismissal is appropriate as the parties have fully addressed the question whether these claims could survive a motion to dismiss in the context of defendants' oppositions to Robinson's motion to amend and Robinson's reply briefs thereto.

The remaining issues in the proposed amended complaint would then be (1) the due process claim relating to Robinson's deprivation of his personal belongings and (2) nine distinct D.C. statutory and common law claims. Given the substantial number of state law claims, and the

---

[9] The Court notes that this procedural due process claim is also closely related to Robinson's claim that defendants tortiously converted his personal belongings under D.C. law. See Am. Compl. ¶¶ 122–31.

dubious merits of the remaining federal claim, the Court must consider whether the continued exercise of supplemental jurisdiction is warranted.  See Araya v. JPMorgan Chase Bank, N.A., 775 F.3d 409, 413–14 (D.C. Cir. 2014); Deppner v. Spectrum Health Care Res., Inc., 325 F. Supp. 3d 176, 190 (D.D.C. 2018).

Federal courts have "supplemental jurisdiction" over state law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).  When exercising supplemental jurisdiction, the district court has a continuing "obligation to employ its discretion to determine whether to exercise supplemental jurisdiction over the ancillary state-law claims." Araya, 775 F.3d at 414; see id. at 416.  Courts may "decline to exercise supplemental jurisdiction" over a state law claim if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C § 1367(c).  When weighing whether to retain supplemental jurisdiction, the concerns of "judicial economy, convenience, fairness and comity [are] relevant." Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1266 (D.C. Cir. 1995) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Anderson v. Holder, 647 F.3d 1165, 1174 (D.C. Cir. 2011) (alterations in original) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

Here, the § 1367 factors, together with the Gibbs considerations, weigh strongly in favor of remand to D.C. Superior Court. To begin, the state law claims in this case "substantially predominate." 28 U.S.C. § 1367(c)(2). Even if part of Robinson's due process claim would survive a motion to dismiss, the Court has serious doubts about its viability. See Diven v. Amalgamated Transit Union Int'l & Loc. 689, 38 F.3d 598, 602 (D.C. Cir. 1994) ("[T]he apparent weakness of [a] claim—even before discovery—is . . . a factor to be weighed in determining whether the state claim 'substantially predominates.'").[10] Meanwhile, nine separate D.C. statutory and common law claims alleged in the proposed amended complaint remain to be considered. Although defendants' oppositions to Robinson's motion to amend suggest they view this as a simple case that could be resolved on Robinson's failure to allege sufficient facts, the D.C. Circuit has recognized that "the process of discerning, interpreting, and deciding a half-dozen state-law claims could be described as undertaking to resolve a 'complex issue of State law.'" Araya, 775 F.3d at 418 (quoting 28 U.S.C. § 1367(c)(1)); see id. (concluding that district court abused its discretion by considering "a substantial number of arguable local statutory and common law claims" raised by a pro se plaintiff). And, indeed, the briefing here suggests that this case "raises issues that have not been directly confronted by D.C. courts," id., such as what factual allegations are required to plead a violation of the "severe weather" provisions of D.C's HSRA, who can be sued under HSRA, and what accommodations Robinson might be entitled to during severe weather.

Meanwhile, "judicial economy and convenience[] provide no serious counterweight." Edmondson & Gallagher, 48 F.3d at 1266. This case is still at the earliest stages, and relatively few judicial resources have been expended on its disposition. Further, "under the circumstances,

---

[10] Robinson's Fair Housing Act claim may also be amenable to repleading. However, even if that claim (pleaded again) could survive a motion to dismiss, the Court would still hold that remand was appropriate.

there seems little difference in convenience for the parties whether they litigate in D.C. or federal court." Id. at 1267. Accordingly, "retaining jurisdiction . . . would be inappropriate," and remand to D.C. Superior Court is warranted. Carnegie-Mellon Univ., 484 U.S. at 357.

## Conclusion

Having concluded that Robinson's federal discrimination claim and federal due process claim as it pertains to the denial of shelter must be dismissed, the Court no longer finds it appropriate to retain jurisdiction over the case. Accordingly, the Court will dismiss the Fair Housing Act claim and the part of the due process claim pertaining to the alleged deprivation of shelter and remand the remainder of the case to D.C. Superior Court for further proceedings. An Order consistent with this Memorandum Opinion will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: May 20, 2024